UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**DISNEY ENTERPRISES, INC.,**

      **Plaintiff,**

-vs-                                          Case No. 6:04-cv-993-Orl-19JGG

**THOMAS J. ARRIGONI, d/b/a VACATION SHOWROOM, a/k/a VACATIONSHOWROOM.COM, TELEPLEX, INC., BRAD HEATH, MICHAEL HERRING, JACOB WOOD and DOUGLAS KAPLAN d/b/a I MARKETING COMPANY a/k/a AMERICAN MANAGEMENT,**

      **Defendants.**

_____

## ORDER

This case comes before the Court on the following:

1. Defendant Thomas J. Arrigoni's Motion for Summary Judgment. (Doc. No. 35, filed on December 17, 2004). Memorandum of Law in Support of Motion for Summary Judgment. (Doc. No. 36, filed on December 17, 2004).

2. Plaintiff Disney Enterprises, Inc.'s Response to Defendant Thomas J. Arrigoni's Motion for Summary Judgment. (Doc. No. 42, filed on January 6, 2005).

## Background

Vacation Showroom, Inc. is a licensed seller of travel packages. (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," filed on January 6, 2005, Ex. B, p. 6). Vacation Showroom did not market itself as a seller of vacation packages but acted as a conduit through which marketing

-2-

companies could sell vacation packages directly to consumers by allowing other companies to sell under Vacation Showroom's travel license.  (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. D, p. 9).  In return, Vacation Showroom would charge a fee for handling customer service and would receive five percent of the sales.  (*Id.*)  (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. I, p. 13).  As long as Vacation Showroom was handling customer service, the company could ascertain if something went awry with the marketing.  (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. D, p.9).  Vacation Showroom did not directly deal with the companies that advertised the packages.  (Doc. No. 43, "Thomas Arrigoni December 16, 2004 Deposition," Ex. H, p. 7).  Instead, Vacation Showroom entered into agreements with marketing companies which were responsible for actually selling the vacation packages.[1]  (*Id.*)  The marketing companies would pay another company to advertise the vacation packages.[2]  (*Id.* at 7-8).  Thomas Arrigoni, operation manager for Vacation Showroom, testified that Vacation Showroom did not have control of the companies that actually advertised the packages.  (*Id.* at 8).

Thomas Arrigoni has been the operating manager of Vacation Showroom since 2002.  (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. B, pp. 5-6).  Deborah Walters, the only

---

[1] When using the term "marketing companies," Thomas Arrigoni explained that he was referring to the companies that sold the vacation packages.  (Doc. No. 43, "Thomas Arrigoni December 16, 2004 Deposition," Ex. H, p. 7).

[2] Arrigoni testified:
"A: I don't know–we didn't deal with the company that did the advertising.  We dealt–when I say marketing company, I meant the company that sells the product.  They do their own advertising.
Q: Right.  So you have–for lack of a better word–the call room, someone like Teleplex who, on the other side, pays someone else to do the advertising, right?
A: That's correct.
Q: And you don't have control of the people on the other side doing the advertising.
A: That's correct."
(Doc. No. 43, "Thomas Arrigoni December 16, 2004 Deposition," Ex. H, pp. 7-8)

corporate officer, owned the company, but Arrigoni managed it.  (*Id.* at 7-8).  As operating manager of Vacation Showroom, Arrigoni testified that his responsibilities included monitoring the customer service department and deciding which marketing companies with which to work and what practices the marketing companies could utilize.  (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. D, p. 9) (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. E, p. 24).  In return for his services, Arrigoni received the after-overhead profits.  (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. E, p. 24).  There were times when no money was left after Vacation Showroom paid its employees, necessitating a loan of funds from Arrigoni to the company.  (Doc. No. 43, "Thomas Arrigoni December 16, 2004 Deposition," Ex. O, p. 43).

Arrigoni testified that he did not instruct the marketing companies on how they should conduct their solicitations.  (Doc. No. 43, "Thomas Arrigoni May 27, 2004 Deposition," Ex. H, pp. 6-7).  Arrigoni stated that he did not give the marketing companies any instructions concerning the use of the Disney trademark or service mark in conjunction with their solicitations.  (*Id.* at 7).  Arrigoni admitted that the advertising companies used facsimile and voice mail as methods of distributing information and he was aware of complaints concerning fax advertising because the complaints would come directly to Vacation Showroom.  (Doc. No. 43, "Thomas Arrigoni December 16, 2004 Deposition," Ex. J, p. 15).

During his December 16, 2004, deposition, Arrigoni identified a series of "fax blast" advertisements utilized to advertise Vacation Showroom's travel packages.[3]  (Doc. No. 43, "Thomas Arrigoni December 16, 2004 Deposition," Ex. M, p. 29).  Arrigoni learned of the faxes because they were attached to lawsuits.  (*Id.*)  When someone sued Vacation Showroom, copies of the fax were

---

[3] "Fax blast" advertisements are facsimile solicitations offering products for sale even though the recipients of the fax did not request the solicitations.  (Doc. No. 47, ¶ 21).

included at the bottom of the stack of paperwork. (*Id.*) Through these faxes, Arrigoni stated that he had actual notice of the content of the faxes. (*Id.* at 30). From Arrigoni's perspective, the complaints addressed the problem of fax blasting but did not address the actual contents of the fax. (*Id.* at 31). No one ever complained about the contents of the fax. (*Id.*)

The faxes advertised Disney vacations. One fax contained the term "Disney's 100 Years of Magic" with the picture of a magic hat. (Doc. No. 42, Ex. 2, "Faxes"). Another fax contained a picture of a castle. (*Id.*) All the faxes used the term "Disney" to some extent. (*Id.*)

In a sworn affidavit Arrigoni averred that at all times material to this case, he was acting solely in his capacity as management consultant to Vacation Showroom, Inc. with respect to the alleged use by Vacation Showroom, Inc. of the intellectual property claimed to be owned by Plaintiff. (Doc. No. 35, Ex. B, "Thomas Arrigoni Affidavit, ¶ 3). Arrigoni also testified that he was aware of another case involving Vacation Showroom, titled *Disney Enterprises, Inc. v. Vacation Showrooms, Inc.*, in the Jacksonville Division of the Middle District of Florida. (*Id.* ¶ 4). Arrigoni stated that he was aware of the Jacksonville litigation, but for a variety of reasons Vacation Showroom did not appear and enter any defenses regarding its liability, although it had an opportunity to do so. (*Id.*) Arrigoni understood that the nature of Disney's claims in the Jacksonville case was to preclude Vacation Showroom from infringing its copyrights and trademarks, rather than seeking any remedies against any of its officers, directors, and shareholders personally. (*Id.*) Arrigoni stated that Deborah Walters was the President and sole shareholder of Vacation Showroom and was not found to have any personal liability in the other action. (*Id.* at ¶ 6). He averred that he and Walters worked closely together in conducting the business affairs of Vacation Showroom, and virtually all action taken on behalf of Vacation Showroom by its management was the result of the collective decision making of Arrigoni and Walters. (*Id.* at ¶ 7).

In the Jacksonville Division of the Middle District of Florida, Disney Enterprises, Inc. filed a suit against Vacation Showroom, Inc.[4] and Deborah Walters for copyright infringement, trademark infringement, unfair competition, and dilution. (Case Number 3:04cv34, Doc. No. 1, "Complaint," filed on January 22, 2004). On March 8, 2004, the Clerk of the Court entered a default against Vacation Showroom, Inc. and Deborah Walters. (Doc. No. 8, filed on March 8, 2004). On July 15, 2004, Disney moved for entry of default judgment and a permanent injunction against Vacation Showroom, Inc. and Deborah Walters. (Doc. No. 14). On October 29, 2004, the trial court entered a permanent injunction as to Vacation Showroom, Inc., enjoining the company, its agents, servants, employees and attorneys, and those persons in active concert or participation with them and who receive actual notice of the Order, from utilizing unauthorized simulations of protected material. (Doc. No. 15, pp. 2-3). The trial court entered judgment against Vacation Showroom and in favor of Disney in the amount of $5,000 each for the infringement of two copyrighted works and $5,000 in statutory damages for a total of $15,000. (*Id.* at 4).

On July 1, 2004, Plaintiff Disney Enterprises, Inc. ("Disney") commenced the instant litigation by filing a complaint against Thomas Arrigoni, Teleplex, Inc., and Brad Heath. (Case Number 6:04cv996, Doc. No. 1). On January 10, 2005, Plaintiff filed an amended complaint against Thomas Arrigoni, Teleplex, Inc., Brad Heath, Michael Herring, Jacob Wood, and Douglas Kaplan alleging copyright infringement against Defendants Arrigoni and Kaplan, and trademark infringement, unfair competition under the Lanham Act, and dilution in violation of state law against all Defendants. (Doc. No. 47).

Defendant Thomas Arrigoni now moves for summary judgment, arguing that collateral

---

[4] In his affidavit, Arrigoni explained that the name of Vacation Showroom, Inc. was improperly styled in this case and the Jacksonville action as Vacation Showrooms, Inc. rather than Vacation Showroom, Inc. (Doc. No. 35, Ex. B, "Thomas Arrigoni Affidavit," ¶ 1).

estoppel bars relitigation of the issue of liability in this proceeding due to the Jacksonville suit and that there is no basis to pierce the corporate veil to create individual liability. Disney counters that the issue presented in the instant case is different from the issue presented in the Jacksonville proceeding such that the doctrine of collateral estoppel is inapplicable and that Arrigoni is liable for Vacation Showroom's actions under theories of contributory and vicarious liablity.

This Order analyzes Defendant Arrigoni's Motion for Summary Judgment.

## Standard of Review

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.* The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied the burden, the Court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the Court must not grant summary judgment. Id. (citation omitted)

## Analysis

### 1.Argument that Collateral Estoppel Bars this Suit

Arrigoni's first argument is that liability is barred by collateral estoppel. Arrigoni contends that the trial court in the Jacksonville Division of the Middle District of Florida entered judgment against Vacation Showroom but specifically declined to enter judgment against Deborah Walters in her personal capacity. Arrigoni argues that both Disney and Arrigoni are bound by that judgment because Arrigoni's liability is wholly derivative of the actions and liability of Vacation Showroom and that there are no allegations in the complaint that would sustain a finding of liability personally against him.

The doctrine of collateral estoppel "bars relitigation of an issue previously decided if the party against whom the prior decision is asserted had 'a full and fair opportunity' to litigate that issue in an earlier case." *Blohm v. C.I.R.*, 994 F.2d 1542, 1553 (11th Cir. 1993) (quoting *Allen v. McCurry*, 449 U.S. 90, 94-95 (1980)). In order for a party to be collaterally estopped, 1) the issue must be identical in the pending case to that decided in the prior proceeding; 2) the issue must necessarily have been decided in the earlier proceeding; 3) the party to be estopped must have been a party or adequately represented by a party in the prior proceeding; and 4) the precluded issue must actually have been litigated in the first proceeding. *Id.*

The Court must first define the issue(s) in the earlier proceeding in the Jacksonville Division. Among the factors to be considered in determining whether the issue(s) in two proceedings is the same are the substantial overlap between evidence and argument and whether new evidence or argument involves application of the same rules of law. RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982); *see David Vincent, Inc. v. Broward County, Fla.*, 200 F.3d 1325, 1330 n.7 (11th Cir. 2000) (citing the Restatement (Second) of Judgments for additional definitions of issue preclusion). The complaint from the Jacksonville proceeding demonstrates substantial overlap in terms of allegations and claims. The defendants in the Jacksonville case were sued for copyright infringement, trademark infringement,

unfair competition, and dilution under both federal and state law.  In the instant case, Disney sues Arrigoni for copyright infringement, trademark infringement, unfair competition, and dilution under state law.  A comparison of the complaints filed in both cases demonstrates that the allegations contained in the Jacksonville complaint are virtually identical to the allegations contained in the instant complaint.  The allegations contained in paragraphs 20 and 21 of the instant amended complaint are not in the Jacksonville complaint.  In paragraph 20 of the amended complaint, Disney alleges that Arrigoni entered into a marketing contract with Teleplex and that Teleplex fulfilled, marketed, advertised and sold travel packages on Arrigoni's behalf.  (Doc. No. 47, ¶ 20).  In paragraph 21, Disney alleges that Arrigoni entered into a marketing contract with Kaplan in which Kaplan fulfilled, marketed, advertised, and sold travel packages on Arrigoni's behalf.  (*Id.* at ¶ 21).  While these allegations are not contained within the Jacksonville complaint, the Jacksonville complaint contains allegations that are substantially similar such that Arrigoni contends that the same issue was addressed in the Jacksonville proceeding as in the instant proceeding.  For example, in the Jacksonville case, Disney alleged that the defendants caused third parties to send out facsimile solicitations on their behalf to advertise their travel packages.  (Case Number 3:04cv34, Doc. No. 1, ¶ 14).

     Disney argues that the issue in the instant case is different from the issue presented in the Jacksonville case because Arrigoni was not a defendant in the prior proceeding.  The Jacksonville case was a suit against Vacation Showroom and Deborah Walters and was not a suit against Arrigoni.  Arrigoni, however, acted as the manager of Vacation Showroom, and the same allegations would apply to his actions in both cases.  Disney responds that it seeks to hold Arrigoni liable on a theory of contributory and vicarious liability and that this issue was not addressed in the earlier proceeding.

     Any Disney claims would be precluded against Vacation Showroom but not against other named Defendants, especially a Defendant who had notice of the prior suit and continued to infringe.

-8-

Because the issues of contributory and vicarious liability were not addressed in the allegations in the Jacksonville case, the issues presented to the Court in the instant case and in the Jacksonville case are different.

Even more importantly, the issues of vicarious and contributory liability as well as Disney's claims of copyright and trademark infringement, dilution, and unfair competition were not actually litigated in the Jacksonville proceeding. Arrigoni argues that an issue has been actually litigated even if a default judgment has been entered and cites *In re Bush*, 62 F.3d 1319 (11th Cir. 1995), in support of his argument. *Bush* is distinguishable from the instant case.

In *Bush*, the issue before the appellate court was whether, in a bankruptcy discharge exception proceeding, a default judgment based upon allegations of fraud may be used to establish the elements of fraud and prevent discharge of the judgment debt. *Id.* at 1322. The Eleventh Circuit found that the issue of fraud was actually litigated in the earlier action in which the default judgment was entered. *Id.* at 1322-23. The appellate court reasoned that the debtor had actively participated in the prior action over an extended period of time, had engaged in dilatory and deliberately obstructive conduct, and had a default judgment entered as a sanction against him. *Id.* at 1324. The appellate court also explained that the general federal rule was contrary to its holding. *Id.* at 1323. Ordinarily, a default judgment will not support the application of collateral estoppel because the issue has not actually been litigated. *Id.*

*Bush* does not stand for the proposition that the entry of a default judgment in every case means that an issue was actually litigated for the purposes of the application of collateral estoppel. The Eleventh Circuit limited its holding in *Bush* to a bankruptcy discharge exception proceeding in which the party against whom the default was entered and who was collaterally estopped acted in a vexatious manner during the earlier litigation. In that case, the Eleventh Circuit also recognized the general rule

that the entry of a default judgment means that an issue was not actually litigated. Therefore, the Court finds that the issues presented in the Jacksonville proceeding were not actually litigated due to the entry of the default judgment. Because a different issue is presented in the instant case than was presented in the Jacksonville proceeding and because a default judgment does not meet the "actually litigated" requirement of collateral estoppel, the Court finds that Disney is not collaterally estopped from pursuing its claims against Arrigoni.

### *2. Argument that Arrigoni is not Individually Liable for Vacation Showroom's Actions*

Arrigoni's second argument is that there is no basis for holding him personally liable for the actions of Vacation Showroom. Arrigoni contends that there is no allegation that Vacation Showroom was used by Arrigoni as a means of perpetrating fraud nor was Vacation Showroom an alter ego for Arrigoni. Arrigoni argues that the essence of Disney's claim involves what the corporation did and not how Arrigoni used the corporation for a fraudulent purpose. As a practical matter, Arrigoni contends that Disney accomplished its goal through the permanent injunction and default judgment in the Jacksonville case and that the injunction is broad enough to preclude him from engaging in the conduct to which Disney objects.

A corporate veil will be pierced where the "corporation's controlling shareholder formed or used the corporation to defraud creditors by evading liability for preexisting obligations." *Estudios, Proyectos E Inversiones De Centro America, S.A. v. Swiss Bank Corporation (Overseas)*, 507 So.2d 1119 (Fla. 3d DCA 1987) (internal citations omitted). The result of piercing the corporate veil is that the controlling shareholder becomes liable for the corporate liabilities. *Id.* (internal citation omitted). The remedy of piercing the corporate veil is also available to hold the corporation liable for the debts of shareholders where the shareholders have formed the corporation or used the corporation to secrete assets and avoid preexisting personal liability. *Id.* Ultimately, the corporate veil may not be

penetrated unless it is shown that the corporation was organized to mislead creditors or to work a fraud on them. *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1120 (Fla. 1984) (quoting *Advertects, Inc. v. Sawyer Indus, Inc.*, 84 So.2d 21, 23 (Fla. 1955)).

The theory of piercing the corporate veil is not applicable to the instant case. The theory applies where a corporation is formed to defraud creditors or to shield an individual from personal liability. An analysis of the amended complaint demonstrates that Disney's suit against Arrigoni is based on Arrigoni's actions in his individual capacity. Disney is not trying to reach Arrigoni's personal assets in an attempt to satisfy Vacation Showroom's liability. In fact, Disney is not alleging or arguing that Arrigoni formed Vacation Showroom in an attempt to defraud creditors or to avoid individual liability for fraudulent actions. Because the theory of piercing the corporate veil does not apply, the Court finds that Arrigoni's argument that he is not individually liable for his own actions is without merit.

### 3. Argument that Arrigoni is Liable for Vacation Showroom's Actions under Contributory and Vicarious Liability Theories

Although not alleged in its complaint, Disney argues that it seeks to hold Arrigoni individually liable for copyright infringement under the theories of contributory and vicarious liability and for trademark infringement under a theory of contributory liability. The Court will address each of these arguments in turn.

#### a. Argument that Arrigoni is Liable for Vacation Showroom's Action of Copyright Infringement under Contributory Liability Theory

Courts have long recognized that vicarious or contributory liability may be imposed in the copyright and trademark fields. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984) (explaining that "vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying circumstances in which it is just to hold one individually accountable for the actions of another"); *see*

-11-

*also Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 854 (1982) (explaining the situations in which vicarious trademark liability may be imposed).

Contributory copyright infringement necessarily follows a finding of direct or primary infringement. *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 845 (11th Cir. 1990). In the instant case, neither party has moved for summary judgment on the issue of direct infringement. For the purposes of analyzing whether Arrigoni is liable under the contributory and vicarious liability theories, the Court will assume *only* for the purposes of this Order that direct infringement has taken place.

Liability for copyright infringement under a contributory theory requires proof of two elements. *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987). First, the defendant must have knowledge of the infringing activity. *Id.* (internal citation omitted). The standard of knowledge is objective: know or have reason to know. *Id.* (internal citations and quotations omitted); *see also Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 846 (11th Cir. 1990) ("there is ample, undisputed evidence in this case to show that defendants-appellants had actual or apparent knowledge that the CMS computer program located in the U-30 chip was copyrighted and that they were violating copyright laws by promoting and selling pirate chips designed to break the VideoCipher® II"). Second, the defendant must induce, cause, or materially contribute to the infringing activity of another. *Casella*, 820 F.2d at 365. (internal citation omitted). In short, a contributory infringer is typically in a position "to control the use of copyrighted works by others" and to authorize "the use without permission from the copyright owner." *Sony Corp. of America*, 464 U.S. at 437.

Addressing the knowledge element of the contributory liability claim, the record reflects that Arrigoni was aware of the fax blast advertisements through the law suits that had been filed. While

these suits complained of the act of sending the faxes rather than the content of the faxes, Arrigoni averred that he was aware of the Jacksonville lawsuit in which Vacation Showroom was named as a Defendant due to the actual content of the faxes and allegations of infringement. Because Disney has proffered evidence demonstrating that Arrigoni knew or had reason to know that the fax advertisements constituted infringing activity, the Court finds that the first element has been met.

Addressing the material contribution element, the record reflects that Vacation Showroom allowed the marketing companies to operate under its travel number. The marketing companies would then pay other parties to advertise the travel packages. Without the use of the travel number, the marketing companies would not be able to operate, sell the vacation packages, or enter into relationships with the advertising companies. Furthermore, Arrigoni testified that his responsibilities as operating manager included making decisions about what marketing companies with which to work and what practices the marketing companies could utilize. Presumably, Arrigoni's responsibilities included the decision of whether the marketing companies should engage advertising companies who used fax blast advertising. Because Arrigoni materially contributed to the advertising companies' infringing activity by allowing the marketing companies to use Vacation Showroom's travel number and by making decisions regarding the types of practices the marketing companies could utilize, the Court finds that Arrigoni materially contributed to the infringing activity and that Arrigoni may be liable under the contributory liability theory for copyright infringement.

### b. Argument that Arrigoni is Liable for Vacation Showroom's Action of Copyright Infringement under Vicarious Liability Theory

Disney argues that Arrigoni is liable for copyright infringement under a theory of vicarious liability. Vicarious liability exists when two elements are present. *Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992) (citing *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). First, the defendant must

possess the right and ability to supervise the infringing conduct. *Id.* Second, the defendant must have an obvious and direct financial interest in the exploitation of the copyrighted materials. *Id.* Lack of knowledge of the infringing activity is not a defense. *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir. 1963). Ultimately, when the "right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials," the purposes of copyright law are effectuated by the imposition of liability on the beneficiary of the exploitation. *Id.*

Examining the first element, the record reflects that Arrigoni had the discretion to allow marketing companies to use Vacation Showroom's travel number. Arrigoni received complaints regarding the advertising companies' action of sending the fax blast advertisements and was aware of the Jacksonville litigation involving allegations of infringement. Arrigoni could have decided to utilize other marketing companies but chose to remain with the same marketing companies in the face of mounting litigation. Because Arrigoni had the ability to exercise control over the marketing companies and the practices in which these companies engaged, the Court finds Arrigoni had the right and ability to supervise the infringing conduct. *See, e.g., Shapiro, Bernstein & Co.*, 316 F.2d at 306-08 (explaining that vicarious liability is appropriate to impose where the defendant had the power to cease the conduct of the infringing party and exercised the right of supervision over the conduct).

Examining the financial interest element of the vicarious liability test, Disney argues that Arrigoni had a financial interest in the infringing activity because Vacation Showroom would receive five percent of the sales of the vacation packages and Arrigoni would personally receive any profits that were left after Vacation Showroom paid the other employees. On the one hand, the fax blast advertisements created lawsuits so it could be said that the advertisements did not necessarily lead to increased sales of the vacation packages. On the other hand, the purpose of the faxes was to advertise the vacation packages, and there is nothing in the record to demonstrate that the fax blast

-14-

advertisements did not increase the sales of the vacation packages such that Arrigoni did not have an interest in the infringing activity. Because there are competing inferences that can be drawn from the facts in the record, the Court finds that Arrigoni had a financial interest in the infringing activity and may be liable for copyright infringement under the vicarious theory.

### *c. Argument that Arrigoni is Liable for Vacation Showroom's Action of Trademark Infringement under Contributory Liability Theory*

Disney argues that Arrigoni is liable for trademark infringement under a theory of contributory trademark infringement. Contributory trademark infringement is applicable if the defendant intentionally induces another to infringe on a trademark or continues to supply a product knowing that the recipient is using the product to engage in trademark infringement. *Inwood Laboratories*, 456 U.S. at 854. In *Mini Maid Services Company v. Maid Brigade Systems, Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992), the Eleventh Circuit clarified the contributory trademark liability standard articulated by the Supreme Court in *Inwood Laboratories*. The appellate court found that a party may be liable for trademark infringement under a contributory liability theory if it intentionally induced the other party to infringe on another's trademark or if it knowingly participated in a scheme of trademark infringement carried out by the other party.[5] *Id.*

Based on the record before the Court, it cannot be said that Arrigoni intentionally induced other parties to infringe on Disney's trademark. However, given Arrigoni's knowledge of the Jacksonville litigation and the continued use of the marketing companies, the Court finds that a trier of fact could determine that Arrigoni knowingly participated in a scheme of trademark infringement.

---

[5] The test articulated by the Eleventh Circuit in *Mini Maid* specifically applies to a franchisor's liability for infringement based on the actions of the franchisee. 967 F.2d at 1522. The instant case in which Arrigoni exerted control over the advertising practices of the advertising companies through the marketing companies is analogous.

## **Conclusion**

Based on the foregoing, the Court **DENIES** Defendant Thomas J. Arrigoni's Motion for Summary Judgment. (Doc. No. 35).

**DONE** and **ORDERED** in Chambers in Orlando, Florida this ___2nd____ day of June, 2005.

*[signature]*
PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record